UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                            :
KELVIN GREER,                               :
                                            :        CASE NO. 1:10-CV-1624
                   Plaintiff,               :
                                            :
        v.                                  :        OPINION & ORDER
                                            :        [Resolving Doc. Nos. 16, 17]
CLEVELAND CLINIC HEALTH SYSTEM:
EAST REGION,                                :
                                            :
                   Defendant.               :
                                            :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        In this FMLA and disability discrimination and retaliation case, Defendant Cleveland Clinic

Health System moves for summary judgment on each of Plaintiff Kelvin Greer's claims. [Doc. 16.]

The Clinic says that no sufficient evidence supports Greer's claims that the Clinic fired him because

he was disabled, or because he exercised his rights under the Family Medical Leave Act.  The Clinic

instead says that it fired Greer because he repeatedly violated the Clinic's attendance policy. [Doc.

16-1.]

        Greer opposes, [Doc. 19], and files a cross-motion for summary judgment on his disability

discrimination and FMLA leave interference claims, [Doc. 17].  The Clinic opposes Greer's cross-

motion. [Doc. 18.] For the following reasons, the Court **GRANTS** summary judgment to the Clinic

and **DENIES** Greer's motion for partial summary judgment.

## I.  Background

Case No. 1:10-CV-1624
Gwin, J.

Greer sues his former employer Cleveland Clinic Health Systems - East Region for discriminatory and retaliatory termination.  Greer says the Clinic took corrective action against him and ultimately fired him because of his disability, and that the Clinic interfered with his protected medical leave. [Doc. 12.] The Court must consider whether the Clinic fired Greer because of his attendance policy violations or, conversely, because of his disability and requests for accommodation.

Greer, worked as a Support Services Assistant for the Clinic from July 2006 until the Clinic terminated his employment in July 2008. [Doc. 12 at 2, 9.] In December 2006, the Clinic had promoted Greer to a full time day shift position, and in 2007 assigned him to work on the fourth floor of Huron Hospital in East Cleveland. [Doc. 17 at 5.] His duties included cleaning, delivering meals to patients, transporting patients or medications throughout the hospital, and other general housekeeping projects. [Doc. 16-6 at 27.]

Prior to joining the Clinic, Greer developed a hand injury that required surgery.  [Doc. 12 at 3.] The surgery was scheduled for September 2006, after Greer began work at Huron Hospital. Because, at that point, Greer had worked at the Clinic for only two months, he did not qualify for protected medical leave under the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq*., which permits eligible employees to take protected medical leave.  The Clinic instead permitted Greer to take a three-month medical leave of absence, from September to November 2006, to cover the surgery and recovery period. [Doc. 16-6 at 26.]

In early 2007, Greer says he was diagnosed with Type II diabetes. [Doc 12 at 3.] Greer says he began to manage his diabetes by controlling his diet and checking his blood sugar. [Doc 12 at 3.] Greer also says that his diabetes has caused other conditions, including a diabetic ulcer on his left

-2-

Case No. 1:10-CV-1624
Gwin, J.

foot, which was diagnosed in December 2007. [Doc. 19 at 4-5; Doc. 20-3 at 87-88.]

Due to pain in his hand and from his foot ulcer, Greer requested a transfer from the hospital's fourth floor to its sixth:  Greer says he believed the work load and pace on the fourth floor was significantly higher than on the sixth. [Doc. 24-3 at 4; Doc. 12 at 8.] Greer's supervisor, Birce Nash, did not approve the reassignment. [Doc. 17 at 7.] Greer says that instead, Nash began assigning him additional duties, such as setting up heavy chairs and tables, that aggravated Greer's hand and foot conditions. [Doc. 17 at 7.]

Greer adds that due to the pressure of work on the fourth floor and the stress from his work environment generally, he twice relapsed—in February and in April 2008—into drug use, after having earlier been sober for several years. [Doc. 17 at 8.]

Once eligible, Greer requested FMLA leave on two occasions.  In December 2007, Greer requested FMLA leave from December 2007 to March 2008 for his hand injury. [Doc. 17 at 6; Doc. 18 at 9.] Greer's doctor submitted an FMLA certification form authorizing two- to four-week block leave, as well as intermittent leave over the subsequent eight weeks for follow-up medical appointments. [Doc. 16-7 at 90-91.] Greer says he submitted a request for leave to the Disability Plans Office but never received notice that the Office had approved the FMLA leave. [Doc. 17 at 6.] The Clinic says it approved his FMLA leave, and that the leave Greer took from December 7 to 17, 2007, was not counted against him. [Doc. 18 at 9.] Greer says he returned to work on December 17, 2007, before the expiration of his FMLA block leave, because he believed the Clinic had not approved the leave. [Doc. 12 at 5.]

In May 2008, Greer's doctor submitted an FMLA certification form authorizing FMLA leave for Greer's foot ulcer. [Doc. 16-7 at 96-98.] Using this certification, Greer applied for both block and

Case No. 1:10-CV-1624
Gwin, J.

intermittent FMLA leave on May 2, 2008; the Disability Plans Office approved six weeks of block

leave but no intermittent leave. [Doc. 17 at 9.] Greer returned from FMLA leave in mid-June 2008.

[Doc. 17 at 9.]

      Exclusive of his FMLA leave, Greer also incurred several unexcused attendance violations

while working for the Clinic.  The Clinic attendance policy requires employees to report any

absences in a timely manner.  Under the policy, an employee's failure to timely report absences,

failure to report by the time the employee's shift begins, or failure to report an absence at all (a no-

call/no-show), for example, result in a variety of corrective actions.  For example, each unexcused

absence or tardy, depending on the circumstances, results in one to four attendance violation points.

[Doc. 16-7 at 71, 81.] Attendance points, once accumulated, result in a series of corrective actions:

(1) counseling; (2) Written Corrective Action; (3) Final Written Warning or suspension; and finally,

(4) termination.  More severe attendance violations may call for the Clinic to take direct corrective

action, rather than issuing points. [*Id.*]

      Greer incurred his first no-call/no-show on January 30, 2007.  Greer says he attempted to

report a late arrival by trying—unsuccessfully—to call the hospital, and that an injury from slipping

on ice later precluded him from reporting to work at all.  [Doc. 12 at 3-4.] Under the attendance

policy in place at that time, the Clinic issued Greer a Final Written Warning, rather than a

suspension. [Doc. 16-7 at 69, 76.]

      In addition to Greer's January 30, 2007 no-call/no-show, the Clinic says Greer's additional

unexcused absences or tardy arrivals accumulated 32 attendance violation points against him. [Doc.

18 at 9.] On July 15, 2008, after an investigation into Greer's unexcused absences, the Clinic issued

Greer a second Final Written Warning for his attendance violations. [Doc. 19-8.]

Case No. 1:10-CV-1624
Gwin, J.

Greer incurred another no-call/no-show on July 11, 2008. Greer says he called the hospital to report a late arrival, but that he had taken strong pain medication for his foot ulcer and accidentally fell asleep instead of reporting to work. [Doc. 12 at 8.] Under the revised attendance policy then in place, corrective action occurring within a year of a previous corrective action required heightened disciplinary action. [Doc. 19-24 at 1.] Because the Clinic had just issued Greer a second Final Written Warning, it says, his most recent no-call/no-show required the next step of disciplinary action: termination. [Doc. 18 at 9.] The Clinic terminated Greer's employment on July 28, 2008. [Doc. 16-7 at 104.]

Greer now brings claims alleging that the Clinic discriminated and retaliated against him because of his disability and because it suspected him of drug use. [Doc. 12 at 9-11.] Greer further contends that the Clinic both interfered with his FMLA leave—primarily by failing to notify him that his December 2007 block and intermittent leave had been approved—and that it retaliated against Greer for taking FMLA leave by imposing disciplinary action and ultimately terminating him. [Doc. 12 at 12-13; Doc. 17.] Greer also alleges that the Clinic wrongfully discharged him in violation of Ohio public policy. [Doc. 12 at 14.]

The Clinic says it terminated Greer for his violations of Clinic attendance policies, and that all disciplinary action resulted from a fair application of those attendance policies to Greer's unexcused absences. [Doc. 16-1; Doc. 18.]

Both parties now move for summary judgment. [Doc. 16; Doc. 17.]

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party

Case No. 1:10-CV-1624
Gwin, J.

has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing a triable issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In responding to a summary judgment motion, the non-moving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence to defeat a properly supported motion for summary judgment." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (internal quotation omitted). The non-moving party must adduce more than a scintilla of evidence to overcome the motion. *Id*.

In deciding summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *Thomas v. Cohen*, 453 F.3d 657, 660 (6th Cir. 2004) (citations omitted). Ultimately, the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Martingale*, 361 F.3d at 301 (citing *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, Inc., 96 F.3d 174, 178 (6th Cir. 1996)) (internal quotations omitted).

### III. Analysis

*A. Discrimination*

Greer first brings a claim of disability discrimination, alleging discriminatory termination and

-6-

Case No. 1:10-CV-1624
Gwin, J.

failure to accommodate Greer's disability. [Doc. 12 at 9.] The Clinic says that Greer does not have a qualifying disability, and that as a consequence it did not deny him disability accommodation. [Doc. 16-1.]

The Ohio Revised Code provides that "[i]t shall be an unlawful discriminatory practice [f]or any employer, because of the . . . disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." O.R.C. § 4112.02(A).  Because "Ohio courts are guided by federal decisions construing the ADA [Americans with Disabilities Act]," *Holt v. Olmstead Tp. Bd. of Trustees*, 43 F. Supp. 2d 812, 825 (N.D. Ohio 1998), the Court is guided by the ADA framework in considering Greer's state law claims.

Where Greer alleges disability discrimination based on indirect evidence, as in his discriminatory termination claim, the Court applies the familiar *McDonnell Douglas* burden-shifting test. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008) (applying *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973), to ADA discrimination claim).  Under this test, a plaintiff must first establish a prima facie case of discrimination.  The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions.  Finally, the burden shifts back to the plaintiff to prove that the defendant's offered reason was mere pretext for discrimination.  The plaintiff may meet its burden at any stage by presenting evidence from which a reasonable fact-finder could infer unlawful discrimination.  *Daugherty*, 544 F.3d at 703.

To establish a prima facie case of disability discrimination, Greer must show that (1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation;

Case No. 1:10-CV-1624
Gwin, J.

(3) he suffered adverse employment action; (4) the Clinic knew or had reason to know of Greer's

disability; and (5) either Greer's position remained open while the Clinic sought other applicants,

or Greer was replaced.  *Id.* (quoting *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365

(6th Cir. 2007)); *see also Swanson v. Univ. of Cincinnati, 268 F.3d 307, 314 (6th Cir. 2001)*

(applying five-prong test to state law claim under O.R.C. § 4112.02(A)).

<u>1. Disability</u>

Because Greer has not shown he suffers from a qualifying disability, he cannot make out a

prima facie case of disability discrimination.

Ohio law defines "disability" to mean "a physical or mental impairment that substantially

limits on or more major life activities, including the functions of caring for one's self, performing

manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working . . . ."[1] O.R.C.

§ 4112.01(A)(13).  Federal law defines the term similarly.  *See* 42 U.S.C. § 12101. Under the Equal

Employment Opportunity Commission's interpretation of these terms, which the parties accept and

employ, a plaintiff is substantially limited in ability when he is either "unable to perform a major life

activity . . . or significantly restricted as to the condition, manner or duration under which [he] can

perform" that activity as compared to an average person.  29 C.F.R. § 1630.2(j)(1).[2] Courts consider

several factors in evaluating whether a plaintiff is substantially limited in a major life activity,

---

[1] O.R.C. § 4112.01(A)(13) also defines "disability" to include "a record of physical or mental impairment; or being regarded as having a physical or mental impairment." *Id.* Greer does not argue he qualifies as disabled under these alternate definitions.

[2] Through the ADA Amendments Act of 2008, which took effect on January 1, 2009, Congress expressly rejected EEOC regulations defining "substantially limits" to require a plaintiff be "significantly restricted" in his performance of a major life activity.  The amendments discouraged strict interpretation of the ADA's terms, and instead instructed courts to construe the term "disability" to favor broad coverage under the ADA.  *Verhoff v. Time Warner Cable*, 299 Fed. App'x 488, 492 n.2 (6th Cir. 2008); 42 U.S.C. § 12102(4).  However, Greer alleges conduct occurring before January 1, 2009.  Because the Amendments Act does not apply to pre-amendment conduct, *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 567 (6th Cir. 2009), the Court must analyze Greer's claims under the prior version.

Case No. 1:10-CV-1624
Gwin, J.

including the impairment's nature and severity, duration or expected duration, and actual or expected

permanent or long-term impact.  29 C.F.R. § 1630.2(j)(2).  Courts must also strictly interpret the

terms "substantially limits" and "major life activity" to "create a demanding standard for qualifying

as disabled." *Toyota Motor Mfg., Kentucky v. Williams*, 534 U.S. 184, 197 (2002), *superseded by*

*statute*, ADA Amendments Act, effective January 1, 2009.

      Greer first says that his diabetes, and related hand and foot problems, qualify as a protected

disability, because, twice in a sixth month period, those injuries rendered him unable to walk or work

for extended periods and led him to take FMLA leave. [Doc. 19 at 3-4.] This claim fails for several

reasons.  First, Greer's diabetes is not inherently a qualifying disability, particularly as Greer

acknowledges that he controls his diabetes by restricting his diet and monitoring his blood sugar.

*See Salim v. MGM Grand Detroit*, 106 Fed. App'x 454, 459 (6th Cir. 2004) (diabetic status *per se*

is insufficient to qualify as a disability under the ADA, *citing Nawrot v. CPC Int'l*, 277 F.3d 896,

903 (7th Cir. 2002)); *see also Hein v. All America Plywood Co*, 232 F.3d 482, 487 (6th Cir. 2000)

(Courts must evaluate plaintiff in medicated state when determining disability, *citing Gilday v.*

*Mecosta County*, 124 F.3d 460, 762 (6th Cir. 1997) (no ADA-qualifying disability where plaintiff's

medication-controlled diabetes did not substantially impair major life activities)).

      Second, Greer suffered no actual or expected long-term impairment or long-term impact

resulting any impairment related to his conditions.  Though Greer was restricted from activity twice

in six months due to hand and foot impairments, temporary restrictions are generally not

substantially limiting, even if episodic. *Rousch v. Weastec*, 96 F.3d 840, 843 (6th Cir. 1996) (citing

*Hamm v. Runyon*, 51 F.3d 721, 725 (7th Cir. 1995)).  Greer took FMLA block leave in December

2007 and again in May 2007, during which doctors restricted his activity.  [Doc. 18-3 at 59; Doc. 19

Case No. 1:10-CV-1624
Gwin, J.

at 5; Doc. 19-16.] Yet at the end of each period of leave—including his September 2006 non-FMLA medical leave—Greer returned to work without medical restriction. [Doc. 18-3 at 31, 60-61; Doc. 18-4 at 15, 34; Doc. 16-7 at 74; Doc. 17-14 at 24.]

Greer provides no other evidence of restrictions beyond these two periods of leave. He says that he has not received medical treatment for his foot ulcer since returning from leave in June 2008, [Doc. 16-6 at 273-74]; reports from Greer's post-June 2008 medical check-ups indicate treatment only for a toe contusion and foot callouses, [Doc. 19-1 at 11-21]. And, though Greer contends that his diabetes and foot impairment were "chronic conditions [that] became life and limb threatening," [Doc. 19 at 5], the evidence shows that Greer's doctor only indicated that the ulcer *could* become infected and thereby threaten life or limb. [Doc. 17-9 at 1.] Greer himself ultimately admits that his foot ulcer was a temporary, now-healed condition. [Doc. 16-6 at 232, 273-74.] Thus, because Greer's conditions only intermittently restricted his activity, they do not qualify as substantial limitations. *Mahon v. Crowell*, 295 F.3d 585, 590-91 (6th Cir.2002) (impairments that only moderately or intermittently restrict major life activities are not substantial limitations).

Third, Greer was not unable to—or substantially restricted in his ability to—walk or work. Greer's doctors restricted him from walking or working only until his hand or foot conditions healed. [Doc. 16-7 at 90, 96.] They returned him to work with no restrictions and with authorized intermittent leave only for check-ups. [Doc. 16-7 at 92, 102.] Greer admits that even with his foot ulcer he was able to walk, and that he consistently walked to the hospital instead of driving. [Doc. 22-4 at 52.]

In addition, Greer acknowledges that he remained capable of working, though he argues that he did so with a painful foot ulcer. [Doc. 22-4 at 52; Doc. 19 at 5.] Greer also says he received a

-10-

Case No. 1:10-CV-1624
Gwin, J.

promotion and several commendations for his good work performance. [Doc. 16-6 at 3-4.] Though

Greer argues that he could not perform tasks such as picking up tables and hanging drapes, he does

not say—and the evidence does not suggest—that those limitations significantly limited his ability

to work altogether.  *See Monak v. Ford Motor Co.*, 95 Fed. App'x 758, 767 (6th Cir. 2004) (Plaintiff

must prove he is "significantly restricted in the ability to perform either a class of jobs or a broad

range of jobs.  The inability to perform a single, particular job does not constitute a substantial

limitation in the major life activity of working.").

    2. Drug Use

    Greer next argues that his relapse into drug or alcohol use provides additional grounds for

his disability discrimination claim.  [Doc. 17 at 14.] In resolving this claim, the Court must consider

whether Greer's alcohol or drug use—or the Clinic's actions allegedly stemming from its perception

that Greer used drugs—qualifies as a disability.

    Greer does not claim to have an alcohol or drug addiction that directly qualifies as a protected

disability.  *Hazlett v. Martin Chevrolet*, 496 N.E.2d 478, 479 (Ohio 1986) (drug or alcohol addiction

is a handicap under O.R.C. § 4112.02.  Greer points instead to three narrow exceptions to the Ohio

Revised Code's general exclusion of conditions resulting from illegal use of a controlled substance

from the term "disability."  These exceptions preclude adverse action on the basis of illegal use, and

apply where an employee: (1) has successfully completed a drug rehabilitation program and no

longer engages in drug use; (2) is participating in a drug rehabilitation program and no longer

engages in drug use; or (3) is "erroneously regarded as engaging in the illegal use of any controlled

substance." O.R.C. § 4112.02(Q)(1)(b)(i)-(iii).

    Greer does not qualify under the first or second exceptions.  Although Greer entered the

-11-

Case No. 1:10-CV-1624
Gwin, J.

Clinic's substance abuse program after his relapse, [Doc. 17-5 at 2], he presents no evidence that he

entered the program to address drug use. [Doc. 21 at 9.]   Greer also offers only his own assertions

that he had ceased using alcohol or drugs upon his termination from the Clinic. [Doc. 17 at 14.]

Greer's claim that he qualifies under the third exception also fails.  Greer variously, and

somewhat contradictorily, states that he relapsed into using either alcohol or drugs, [Doc. 17 at 14],

both alcohol and crack-cocaine, [Doc. 18-3 at 5-6], or at least alcohol, [Doc. 17-15 at 2].  He then

only vaguely avers that he was never "impaired" by or "under the influence of drugs" during his

work *at* the Clinic. [Doc. 21 at 9.] Greer therefore fails to show that the Clinic erroneously—rather

than accurately—regarded him as engaged in illegal drug use.

### 3. Pretext

Moreover, even if Greer has established a prima facie case of disability discrimination, he

has not adduced sufficient evidence that the Clinic's proffered nondiscriminatory reason for his

discharge was pretext for unlawful discrimination.

The Clinic says that it terminated Greer because his unexcused attendance and no-call/no-

shows violated the Clinic's Attendance and Corrective Action Policy. [Doc. 16-1 at 18.] Under the

policy, Greer's first no-call/no-show earned him either a suspension or Final Written Warning; the

Clinic chose the latter. [Doc. 16-7 at 76; Doc. 18-3 at 42.] When Greer had accumulated 32 points

for attendance violations—well beyond the 18 points at which the policy called for corrective

action—the Clinic issued a second Final Written Warning. [Doc. 16-7 at 103.] The Clinic says it did

so after a brief investigation to ensure that none of Greer's FMLA leave had been counted as

attendance violations. [Doc. 19-7 at 13.] Finally, the Clinic says that upon Greer's second no-call/no-

show, the attendance policy required a step up in corrective action, leaving only the option of

-12-

Case No. 1:10-CV-1624
Gwin, J.

termination.   [Doc. 16-7 at 104.] The Clinic's proffered reason has both a basis in fact and is

sufficient to warrant its decision to fire Greer.  *See Texas Dept. of Community Affairs v. Burdine*, 450

U.S. 248, 255-56 (1981) (describing defendant's burden of production under *McDonnell Douglas*).

    Because Greer has not shown the Clinic's reason was a pretext, his disability discrimination

claims fails at the pretext level, as well.  To demonstrate pretext, a plaintiff must offer evidence that

the employer's proffered reason (1) has no basis in fact, (2) did not actually motivate the termination,

or (3) was insufficient to motivate the action.  *Kocsis v. Multi-Care Management*, 97 F.3d 876, 883

(6th Cir. 1996).  In doing so, he must present "circumstances which tend to prove that an illegal

motivation was *more* likely than that offered by the defendant.  In other words, the plaintiff [must

show] that the sheer weight of the circumstantial evidence . . . makes it more likely than not that the

employer's explanation is a pretext, or coverup."  *Imwalle v. Reliance Medical Products*, 515 F.3d

531, 546 (6th Cir. 2008) (emphasis in original) (internal quotations omitted).  A plaintiff cannot

survive summary judgment merely by denying the employer's proffered reasons for termination

without offering evidence in support of his denial.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585

(6th Cir. 1992) (affidavits containing "conclusory allegations" and "subjective beliefs" are "wholly

insufficient" to establish pretext).

    Greer challenges the Clinic's interpretation and application of its attendance policy.  He

alleges that the Clinic skipped progressive discipline steps and timed the issuance of its corrective

actions to orchestrate Greer's termination. [Doc. 19 at 7.] Greer argues that, contrary to the Clinic's

assertion, a no-call/no-show does not automatically result in corrective action but instead leads to

accumulation of more attendance points.  Because the Clinic had simply added points for an April

26, 2008 no-call/no-show to the write-up for his second Final Written Warning, [Doc. 19-8], Greer

Case No. 1:10-CV-1624
Gwin, J.

says, his July 11, 2008 no-call/no-show should have received similar treatment.  Greer says that

Clinic supervisors instead separated the July 11 infraction to ensure termination. [Doc. 19 at 8.] In

support of this argument, Greer points to evidence that, pursuant to the Clinic's instruction,

supervisors waited several days after Greer's second Final Written Warning to issue his termination.

[Doc. 19-7 at 155-57; Doc. 19-8. ]

Greer's argument is simply not borne out in the evidence.  First, by the time Greer took

FMLA leave on May 18, the Clinic had begun to process a Final Written Warning for Greer's

attendance violations.  These violations included a no-call/no-show on April 26; it is unclear whether

they also included a May 2 no-call/no-show.  After Greer returned from leave on June 17, the Clinic

submitted the processed Final Written Warning to its Human Resources department.  While Human

Resources investigated the action and began obtaining the necessary approval, Greer incurred

another no-call/no-show. [Doc. 19-8.] That the Clinic processed this no-call/no-show separately from

a corrective action already being finalized, even if it could have amended the prior corrective action,

does not itself raise an inference of pretext.  And, under the attendance policy then in place, a no-

call/no-show occurring within a year of previous corrective action "should progress to the next step,"

[Doc. 19-24 at 1], which in Greer's case meant termination.

Moreover, Greer's only evidence that the motivations behind the Clinic's actions were

discriminatory rest in his own conclusory allegations. [Doc. 19 at 9.] He acknowledges that the

Clinic based his termination on an interpretation of its attendance policy but offers no evidence

tending to prove that this interpretation was more likely taken with discriminatory motivation than

not.  *See Imwalle*, 515 F.3d at 546.  Greer has thus not met his burden to show the Clinic's

explanation for his termination is pretext.

-14-

Case No. 1:10-CV-1624
Gwin, J.

####     4. Failure to Accommodate

Finally, Greer contends that the Clinic discriminated against him by failing to accommodate his disability—namely, by refusing to reassign Greer to a lighter workload on the hospital's sixth floor. [Doc. 17 at 21 (citing *Kleiber v. Honda of America Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007) (discrimination includes "not making reasonable accommodation to the known physical limitations of an otherwise qualified individual with a disability.")). ] Because Greer does not have a qualifying disability, his assertion that the Clinic discriminated against him by failing to accommodate his disability also fails. *Curry v. Empire Berol*, No. 97-5012, 1998 WL 13407, at *4 (6th Cir. Jan 7, 1998) (under ADA, employer not required to accommodate employee who is not disabled); *see Kleiber*, 485 F.3d at 869 (where plaintiff presents direct evidence of discrimination, he must first show, among other things, that he is disabled).

*B. FMLA Leave Interference*

Greer next says that the Clinic interfered with his right to take medical leave protected under the Family Medical Leave Act (FMLA). The FMLA permits eligible employees to take unpaid temporary medical leave for up to twelve weeks in a twelve month period. 29 U.S.C. § 2612. The Act also prohibits employers from interfering with, restraining, or denying an employee's FMLA leave or attempt to take leave protected by FMLA. 29 U.S.C. § 2615(a)(1).

Greer says the Clinic interfered with his FMLA leave on two occasions. First, Greer argues that though the Clinic approved block and intermittent FMLA leave in December 2007 but emailed notice of its approval to the wrong address. Greer says he never knew his leave had been approved and, as a consequence, he continued to work from January to March 2007 as his foot ulcer became more painful. [Doc. 19 at 10.] Had he known that the Clinic approved FMLA leave, Greer says he

-15-

Case No. 1:10-CV-1624
Gwin, J.

would have taken the leave for his foot and an array of other health problems. [Doc. 17 at 18; Doc. 24-3 at 20.] Second, Greer says the Clinic denied his request for intermittent FMLA leave in May 2008, despite certification from Greer's doctor authorizing the leave. [Doc. 19 at 10-11.]

In response, the Clinic says that Greer's claim must fail because Greer never submitted notice of, or medical certification for, the leave he now claims he should have received. [Doc. 16-1 at 23-25; Doc. 18 at 25.]

To make out a claim of FMLA leave interference, a plaintiff must show that (1) he is an "eligible employee;" (2) the defendant is an "employer;" (3) the plaintiff was entitled to leave under the FMLA; and (4) the plaintiff gave his employer notice of his intention to take FMLA leave. *Edwards v. Dialysis Clinic*, 423 F. Supp. 2d 789, 795 (S.D. Ohio 2006) (citing *Hodge v. Honda*, 384 F.3d 238, 244 (6th Cir. 2004)).

To satisfy the notice prong of this test, a plaintiff does not necessarily need to assert his FMLA rights expressly, but can often "give the employer enough information for the employer to realize that [he] is requesting time off for a serious health condition." *Edwards*, 423 F. Supp. 2d at 795 (citing *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 723 (6th Cir. 2004)).  However, employers may require FMLA leave requests to be supported by a written certification from a health care provider.  29 U.S.C. § 2613(a).  Such certification must state when the health condition at issue started, how long it will likely last, and any other appropriate medical facts regarding the condition. Where the certification authorizes intermittent leave, it must include the duration of the intermittent leave or the dates for which intermittent leave is necessary.  29 U.S.C. § 2613(b).

Regarding Greer's December 2007 FMLA leave, the Clinic does not dispute that it authorized intermittent leave or that Greer failed to receive notice of the Clinic's authorization.  However, the

Case No. 1:10-CV-1624
Gwin, J.

Clinic argues—and the Court agrees—that even had Greer known of the authorization, he could not have taken intermittent leave for his foot ulcer. The Clinic's authorization documents require medical certification for FMLA leave. [Doc. 16-7 at 93, 99.] In December 2007, Greer submitted medical certification for leave related to his hand injury, which authorized intermittent leave only for follow-up appointments. [Doc. 16-7 at 88, 90.] The certification did not extend to Greer's foot condition, high blood pressure, or blood sugar problems—conditions Greer says were aggravated because he could not take FMLA leave. [Doc. 21 at 3.] Greer makes no claim that the Clinic interfered with his right to take FMLA leave for his hand condition. And indeed, Greer's doctor released him back to work from block leave with no medical restrictions. [Doc. 16-7 at 92.]

The Court finds Greer's argument that the Clinic gave him negative attendance points for absences that should have been covered by FMLA leave unconvincing for the same reasons. There is no evidence that the late arrivals and absences Greer accumulated during this period stemmed from his hand condition. In fact, there is no evidence—other than Greer's own assertions, [Doc. 19-5 at 219-20]—that these tardies and absences stemmed from any medical condition at all. *See Allen v. Butler Cnty. Comm'rs*, 331 Fed. App'x 389, 394 (6th Cir. 2009) ("[T]he mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation," particularly if employer has a legitimate reason for engaging in the challenged conduct.)

Regarding Greer's May 2008 FMLA leave, Greer presents no convincing evidence that his doctors certified intermittent leave at that time. Greer's physician did certify him for a series of five treatments, at five- or seven-day intervals. [Doc. 19-16.] However, the certification indicates that these treatments were to take place over an approximately one month period, during which the physician said Greer would be totally incapacitated. [*Id.*] The physician requested "no work for the

-17-

Case No. 1:10-CV-1624
Gwin, J.

duration of [Greer's] treatment." [*Id.*] Thus, though the *treatments* would be somewhat intermittent,

the certification itself authorized block leave.  The Clinic granted Greer FMLA block leave from

May 2, 2008 to June 13, 2008. [Doc. 16-7 at 99, 101, 102.]  Because there is no evidence that any

physician certified Greer for intermittent leave in or around May 2008, Greer's claim that the Clinic

interfered with such intermittent leave fails.

The Court thus denies Greer's motion for partial summary judgment, and grants summary

judgment to the Clinic on this claim.

*C. Retaliation*

Greer next argues that the Clinic retaliated against him for requesting reassignment to the

hospital's sixth floor, [Doc. 19-23], for seeking substance abuse counseling, [Doc. 19-25], and for

taking protected FMLA leave.  Greer says that the Clinic took corrective action against him, assigned

him more work, and ultimately terminated him in response to his requests and leave. [Doc. 19 at 12-

13.]

To present a prima facie case of retaliation, a plaintiff must show that (1) he engaged in

protected activity, (2) he suffered adverse employment action, and (3) a causal link exists between

the protected activity and adverse action.  *Grubb v. YSK Corp.*, No. 09-4352, 2010 WL 4807079,

at *5 (6th Cir. 2010) (slip copy).  Under the *McDonnell Douglas* framework, after a plaintiff has

made a prima facie case, the burden shifts to the defendant to offer a non-retaliatory reason for the

adverse action.  The plaintiff must then show this reason to be pretext.  *Id.* The Clinic challenges all

three bases of Greer's retaliation claim for lack of causation.[3/] [Doc. 22 at 11.]

_____

[3/]The Court notes, as to Greer's FMLA leave retaliation claim, that the Clinic's failure to approve Greer for intermittent leave in May 2008 does not constitute adverse action where, as previously discussed, Greer had not submitted medical certification for intermittent FMLA leave.

The Court also notes that because Greer does not have a qualifying disability, his transfer request is not a

-18-

Case No. 1:10-CV-1624
Gwin, J.

Greer presents insufficient evidence of a causal connection.  Greer says that the Clinic initiated corrective action against him days or weeks after his requests and after his return from FMLA leave.  However, the Sixth Circuit has previously held that temporal proximity alone is typically insufficient to establish causation.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) (citing *Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986)).  Greer offers no other indicia of a causal connection.  *See Lindsey v. Whirlpool Corp.*, 295 Fed. App'x 758, 770 (6th Cir. 2008) (addressing Title VII retaliation claim).

Even assuming that the close temporal proximity between Greer's activity and the Clinic's corrective actions raises a triable issue as to causation, *Lindsay v. Yates*, 578 F.3d 407, 418-19 (6th Cir. 2009) (causation may be proven through circumstantial evidence of "suspicious timing" where temporal proximity is extremely close), Greer's retaliation claim still fails.  The fact remains that Greer cannot rebut the Clinic's non-retaliatory reasons for its actions.  The Clinic says it terminated Greer's employment because of his attendance policy violations.  Greer offers no evidence tending to show this reason to be pretext for retaliation.  Greer says that "it seemed like each time Greer requested medical leave or an accommodation," the Clinic retaliated against him. [Doc. 19 at 13.] At this stage of the burden shifting test, temporal proximity certainly cannot establish pretext.  *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 317 (6th Cir. 2001).  And, as with his discrimination claim, Greer's own conclusory allegations of an improper motive behind the Clinic's actions are also insufficient to show pretext.

Finding no material issues of law or fact in Greer's retaliation claims against the Clinic, the Court grants summary judgment to the Clinic on these claims.

---

protected request for disability accommodation.

-19-

Case No. 1:10-CV-1624
Gwin, J.

*D. Wrongful Termination*

Lastly, Greer brings a claim for wrongful discharge in violation of Ohio public policy. [Doc. 12 at 14.] The Clinic contends that Ohio common law limits actions for wrongful termination to at-will employees, and that, as a Union member, Greer was not an at-will employee. [Doc. 16-1 at 26.] Greer does not oppose the Clinic's argument, and has therefore abandoned this claim.  The Court thus grants summary judgment to the Clinic on this issue.

**IV. Conclusion**

For the foregoing reasons, the Court **GRANTS** the Clinic's motion for summary judgment and **DENIES** Greer's motion for partial summary judgment.

IT IS SO ORDERED.


Dated: February 10, 2011                                    s/         *James S. Gwin*
                                                                              JAMES S. GWIN
                                                                              UNITED STATES DISTRICT JUDGE